IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CHARLES D. WILSON,                    * CIVIL ACTION
                   Plaintiff          * NO. 05-122E
                                      *
        vs.                           *
                                      *    ORIGINAL
MOTION CONTROL INDUSTRIES,            *
DIVISION OF CARLISLE CORPORATION,     *
RETIREMENT PLAN FOR BARGAINING        *
UNIT EMPLOYEES OF MOTION CONTROL      * Senior Judge
INDUSTRIES, DIVISION OF CARLISLE      * Maurice B. Cohill, Jr.
CORPORATION,                          *
                   Defendants         *
                                    *    *    *


            Deposition of :  **CHARLES D. WILSON**

            Date          :  Tuesday, August 1, 2006
                             10:07 a.m.

            Place         :  Law Offices of Meyer & Wagner
                             115 Lafayette Street
                             St. Marys, PA  15857

            Reported by   :  Elizabeth Schreiber Nissel
                             RPR and Notary Public


A P P E A R A N C E S:

        JASON METTLEY, Esquire, via telephone
            appeared on behalf of the Plaintiff

        NEAL R. DEVLIN, Esquire, via telephone
            appeared on behalf of the Defendants


            SCHREIBER REPORTING SERVICE
                   P.O. Box 997
              St. Marys, PA 15857
                (814) 834-5337

**EXHIBIT**

A

INDEX OF WITNESS, CHARLES D. WILSON

<u>EXAMINATION</u>                                                    <u>PAGE</u>

By Mr. Devlin                                                      3

1                            CHARLES D. WILSON, called as

2   a witness, was sworn and testified as follows:

3                      DIRECT EXAMINATION

4   BY MR. DEVLIN:

5       Q.    Hi, Mr. Wilson.  My name is Neal Devlin, and I

6   represent Motion Control, Carlisle Corporation and

7   actually all of the defendants in a lawsuit in which you

8   filed.

9       A.    Okay.

10      Q.    And prior to starting your deposition, I just

11  wanted to put one or two things on the record which I

12  briefly discussed with Mr. -- with your attorney, Mr.

13  Mettley, just beforehand.

14      A.    Um-hmm.

15      Q.    We're conducting this deposition as part of Phase 1

16  discovery in this case, and so the deposition is going to

17  be limited to those issues relevant to two threshold legal

18  issues that were identified by us and your counsel and

19  that are the limits of Phase 1 discovery.  The reason I'm

20  putting that on the record is because it's my

21  understanding that our arrangement with Mr. Mettley and

22  your counsel is that we're doing this discovery and this

23  deposition and reserving the right, in the event we get

24  into Phase 2 discovery, to do a subsequent deposition

25  related to some of the factual issues including factual

1    issues related to your claim of a disability.

2         Is that right, Jason?

3         MR. METTLEY:  That is accurate, Neal.

4    BY MR. DEVLIN:

5    Q.    Beyond that, I don't expect this to be a very long

6    deposition, Mr. Wilson, so -- have you ever been deposed

7    before?

8    A.    Ever been to where?

9    Q.    Have you ever been deposed before?

10   A.    No.

11   Q.    It's a situation -- obviously I'm doing this by

12   phone, so it's a little bit different than a standard

13   deposition, but I'm just here to ask you some questions to

14   get some factual information regarding the claims you've

15   alleged.  There are a couple of standard ground rules for

16   depositions that usually make us proceed a little bit

17   easier, and because we're doing this by phone, they're

18   probably even more important.

19        The two key ones really are:  I'm going to do my

20   best to ask my questions and then, when I'm done, pause

21   and then allow you to answer it.  It's very easy -- in

22   normal depositions and especially in ones over the

23   phone -- for us to end up talking over one another, so I

24   will do my very best to pause when I'm done with my

25   question and wait for your answer, and then I will wait

1  for you to do the same.  If we end up talking over one

2  another, I may end up going back and just repeating things

3  to make sure they're clear on the record.

4      A.    Okay.  That's fine.

5      Q.    The other thing is, I will do my best to make my

6  questions clear, but if at any point you don't understand

7  my question, just let me know and I will rephrase it.

8  And finally, if at any point you need a break or you want

9  to confer with your counsel, let me know.  Understanding

10 that we're doing this by phone, you know, if something

11 comes up and you want to confer in private with Attorney

12 Mettley, just let me know and I will be happy to get off

13 the line or you guys can get on another line there and

14 talk, whatever works.  Is that fair enough?

15     A.    Fair enough.

16     Q.    Can I just get your name for the record?

17     A.    Charles D. Wilson.

18     Q.    And what is your current address?

19     A.    1990 Ridgway Johnsonburg Road, Ridgway, PA, 15853.

20     Q.    Is there any reason today that you can't give

21 accurate and truthful testimony?  For instance, are you on

22 any medication that would prevent you from doing that or

23 anything else?

24     A.    Not right now.  I do take pain medication, but I

25 haven't taken any today.

1    Q.    Okay.  Can I just get a brief employment history

2    for you starting with whatever employment you held prior

3    to your employment at Motion Control and then the period

4    of your employment at Motion Control?

5    A.    Before I worked at Motion?

6    Q.    Yeah, both.  Give me what you did before at Motion

7    and then go into Motion.

8    A.    Well, I used to work -- at one time I worked at

9    Weyerhaeuser for a year, and then when I was -- I got laid

10   off there and I got hired at Motion Control.  At that time

11   it was called Molded Materials.

12   Q.    Okay.

13   A.    Yeah.  And I've been there probably a little over

14   30 years.

15   Q.    Okay.  When were you hired at what is now known as

16   Motion Control and then Molded Materials?  What year?

17   A.    Oh boy, '72.

18   Q.    Okay.  And when did you stop working there?

19   A.    When did they hang it up?  '02, wasn't it?  When

20   did they close the doors there?  I think it was '02.  I'm

21   not positively sure of a certain date there, but it was in

22   around that period there.

23   Q.    Okay.  Let me just get the complaint here so we

24   have a point of reference.  I believe that the last day of

25   production work at Motion Control, the facility that you

1    worked, was January 11, 2002.

2      A.    Yeah.   Okay.   I knew it was in around there

3    somewhere, but I thought it was in '02.

4      Q.    And is that when you stopped working there, on

5    January 11, '02?

6      A.    Yeah.   That's when they told everybody to get out.

7      Q.    Okay.   What were your general job duties at Motion

8    Control?

9      A.    I was maintenance electrician, and I was also a

10   lead man for a certain amount of time.

11     Q.    Did any of your responsibilities that you had as a

12   maintenance electrician or lead man while at Motion

13   Control continue past January 11, 2002?

14     A.    You're saying at Motion?

15     Q.    Yes.

16     A.    No.

17     Q.    Okay.

18     A.    I mean, once they told us to get out, that was it.

19     Q.    Okay.   Obviously the -- part of your claim or the

20   basis of your claim revolves around a retirement

21   disability benefit plan that was in place for Motion

22   Control.   You're aware of that.   Right?

23     A.    Right.

24     Q.    I want to get an understanding as to what your

25   understanding of the procedure was to apply for disability

1  benefits through that plan.  I just want to understand

2  what you knew at the time, let's say as of January 11,

3  2002, and anytime before that, what you understood to be

4  the procedure to apply for and obtain benefits under the

5  disability portion of that --

6      A.    Are you saying what I understood after I became

7  disabled by Social Security?  Is that what you're saying?

8      Q.    Yeah.  I want to know what you understood to be the

9  procedure you had to follow under the plan and sort of

10  when you learned that stuff.

11     A.    Well, the only thing I knew about the plan was what

12  we got in -- what they sent us in the mail and -- you

13  know, every -- for every contractor it was a -- you know,

14  whatever the pension plan, how it was set up.  It was

15  stated in there, in that pension plan, that if you became

16  disabled somehow, that the pension would be, you know, for

17  you, you know, if you -- you know, if Social Security --

18  if -- Social Security had to state that you were disabled,

19  and then you could get your Social Security pension -- I

20  mean, your disabled pension.

21     Q.    Okay.

22     A.    That part I knew.  Now, do you want to know what --

23  do you want to know what I did after Social Security did

24  say I was disabled, or what do you want to do?

25     Q.    Let me ask you a question before that.

1    A.    Okay.

2    Q.    So it was your understanding -- and from your

3  answer I'm assuming this, so tell me if it's wrong, but

4  I'm assuming that while you were employed at Motion

5  Control, prior to January 11, '02, you understood that if

6  you were to go in and get any disability benefits under

7  the Motion Control plan, you first had to be determined to

8  be disabled by the Social Security.

9    A.    Oh sure.  It's stated like that right in the book.

10    Q.    Okay.  And so you felt that -- so it was your

11  understanding that, once you were deemed disabled by the

12  Social Security Administration, you could then go through

13  a process to apply for benefits under the plan?

14    A.    That's what I took for granted.

15    Q.    Let me know prior -- and again, prior to January

16  11, 2002 -- and the answer to this may be you had no

17  understanding.  And if that's it, that's fine.  Prior to

18  January 11, '02, what did you understand to be the

19  procedure you had to go through with respect to the plan?

20  In other words, was there an application?  How did you get

21  the application?  Who did you call for the application?

22  That type of stuff.

23    A.    This is while I was still working at Motion?

24    Q.    Right.

25    A.    Well, while I was still working at Motion, you

1   know, I'm sure you could go right through Motion Control

2   in Ridgway.  You know what I mean?  You understand?

3     Q.   Yeah.  Who would you have gone through?  Was it one

4   office or one specific person?

5     A.   Human resources at Motion Control in Ridgway,

6   that's what I gathered, you know.  They -- as far as I

7   know, that's what you had to do before -- that's when I

8   was still working at Motion, yes.

9     Q.   All right.  And that's all I want to know is what

10  your understanding of it was.  Okay.  Now, you had

11  indicated that you -- tell me what you did after January

12  11, '02, with respect to what your understanding was what

13  you had to do to get disability benefits.

14    A.   After I was disabled?

15    Q.   Yeah.  Well, first let's ask this question so we

16  have a point of reference.  What date were you disabled?

17    A.   They considered me disabled May 3 of '03.

18    Q.   Okay.  And this is one of the things that I

19  generally discussed with Attorney Mettley right

20  beforehand.  Do you understand that I'm not looking to get

21  into any of the underlying merits or facts related to your

22  disability?  But just so that we have some basic idea

23  here, what is the nature of your disability?

24    A.   My back.  I've had back surgeries and that, and I

25  fell off a 12-foot stepladder, is what happened to me.

1  It's an accident.

2      Q.    Okay.  When did you fall off that stepladder?

3      A.    January 14 of '03.

4      Q.    Okay.  When did you first see a doctor regarding

5  that fall?

6      A.    The next day.

7      Q.    You didn't fall off that stepladder at Motion

8  Control, right?

9      A.    No, Huntington Foam.

10      Q.    What's Huntington Foam?

11      A.    What's that?

12      Q.    What is Huntington Foam?

13      A.    It's a foam plant.

14      Q.    Okay.  Were you working there?

15      A.    Yes.

16      Q.    Okay.  When did you start working there?

17      A.    Oh boy.  The date I can't remember, but it was

18  after Motion Control closed up, you know.  I'd say

19  probably about -- had to be the later part of '02.

20      Q.    Okay.  So you fell off a stepladder while working

21  at Huntington Foam on January 14, '03.  Is that right?

22      A.    Right.

23      Q.    Okay.  When did you apply for Social Security

24  disability benefits?

25      A.    I applied for that around -- when did I apply for

1    that?  That would have been on May 3, May 3 of '03,

2    because that's when I -- no.  I take that back.  It was

3    probably a couple months after that.  I don't know the

4    specific date, but --

5        Q.    And --

6        A.    I was considered disabled May of '03.  That part --

7    I mean, that date I remember.

8        Q.    So the Social Security Administration determined

9    that -- the onset date of your disability was May 3, '03?

10       A.    Right.

11       Q.    When did you receive your first Social Security

12   disability check?

13       A.    It was probably around November of '04.

14       Q.    Okay.  Do you know if you got checks retroactive to

15   any point?

16       A.    Oh yes, to -- well, it was retroactive -- August 21

17   is when they made my determination that I was going to get

18   my disability.

19       Q.    Of '04.

20       A.    August 21 of '04 is when they sent me the letter

21   stating that I would get my disability.

22       Q.    And then you believe you actually physically got

23   the first check sometime in November of '04.  Is that

24   right?

25       A.    Yeah.  It was in around there because then there

1  was a backdated check too.  You understand what I mean?

2     Q.    Yeah.    That's what I'm trying to get to.    In other

3  words -- and again, this is nothing more than an

4  assumption, so correct me if I'm wrong -- but if they had

5  an onset date of May of 2003 -- and I notice in your

6  complaint you regard -- you reference that you were

7  determined to be entitled to benefits retroactive to --

8     A.    Right, but that's only six months -- that would

9  have been six months after May 3, you know.  They always

10  go six more months, you know.  Even though they determine

11  you disabled in '03, you know, you don't get your benefit

12  for six months.  You understand --

13        MR. METTLEY:  Neal, I can make this real easy.  I'm

14  looking at his notice of award, and it is consistent with

15  what he's been testifying to.  And it says on this -- and

16  I'd be happy to send you a -- "You are entitled to monthly

17  disability benefits beginning November 2003.  We found

18  that you became disabled under our rules May 3, 2003."

19  And the date of this notice is August 21, 2004.

20        THE WITNESS:  That's what I said.

21        MR. METTLEY:  It is what you said, Chuck.  I just

22  thought I'd make it easier.

23        THE WITNESS:  Yeah.

24        MR. DEVLIN:  And Mr. Wilson, I didn't have that, so

25  I wasn't trying to trick you or anything.

1          THE WITNESS:  Oh yeah.  I understand that.

2          MR. DEVLIN:  Jason, if you don't mind sending that

3     up to me, that would be great because that would be very

4     helpful.

5          MR. METTLEY:  I have no problem doing that.

6          THE WITNESS:  I don't have a problem either.

7          MR. METTLEY:  As a matter of fact, it's a two-page

8     notice.  What I have is two pages.

9          THE WITNESS:  Yeah.  That's a copy.  The page they

10    give you is -- you know, the Page 2 is on the back, you

11    understand.

12         MR. METTLEY:  Oh.

13         THE WITNESS:  I didn't give you the original.

14         MR. METTLEY:  Okay.  So I can give you what I have.

15         MR. DEVLIN:  Yeah.  That's fine.  And if at some

16    point -- whatever you have, obviously, and at some point

17    we'll have to complete one if you don't have it, Jason,

18    but --

19         MR. METTLEY:  I'm with you.

20    BY MR. DEVLIN:

21    Q.   Okay.  So on August 21 of '04 you receive a

22    determination from Social Security that you are disabled.

23    Correct?

24    A.   Yes.

25    Q.   And they find that you were disabled, the onset

1    date May of '03, and therefore you're entitled to payment

2    starting November of '03?

3        A.    '03, right.

4        Q.    When was the first time that you made any attempt

5    to secure disability benefits under the Motion Control

6    plan?

7        A.    That would have been -- after I got my

8    determination from Social Security, I -- you know, I

9    talked to the -- you know, some people at the union, and

10   they gave me the phone number and a name of a person and

11   an 800 number to call, and I called that number.

12       Q.    All right.  Who did you talk to -- and I don't want

13   to -- if it was Mr. Mettley or Mr. Eberle or anybody else

14   from their law firm or any other lawyer representing the

15   union, I don't want to know anything about any

16   conversations you had there, but if it wasn't those

17   people, who did you talk to at the union to get that

18   information?

19       A.    Well, Larry Donachy was the chief steward.  I mean,

20   I got the phone number from him.  Ed Greenawalt was the

21   president of the union.  You know, they were -- Larry's

22   who I got the number from, but --

23       Q.    Okay.  This is a question that I might guess the

24   answer is you have no idea, but do you remember what the

25   number was?

1    A.    Yes, I do.

2    Q.    There you go.  What was the number?

3    A.    800-840-5635.

4    Q.    Okay.  And what did you understand to be the --

5    A.    I got an extension.  Do you want that too?

6    Q.    Sure.

7    A.    7938.

8    Q.    Okay.  And did you have the name of a person who

9    you were supposed to call?

10   A.    Well, the only name I had was Norm Tarbells.

11   Q.    Did you know who he was?

12   A.    All I could -- only thing I was to understand that

13   he was a human resource -- you know, he was the human

14   resources person.  That's the only thing I know.

15   Q.    Had you ever had any contact with Mr. Tarbell

16   before this?

17   A.    No.

18   Q.    Was he a human resource person?

19   A.    As far as I know.

20   Q.    Was he a human resource person at Motion Control

21   when you were working there at the facility where you

22   worked?

23   A.    No, no, no, no.  He was down Charlottesville.  This

24   is after Motion closed up.

25   Q.    I understand.  Okay.  So Mr. Donachy gave you the

1    phone number for Mr. Tarbell and told you to call him.

2      A.    Right.

3      Q.    And what was your understanding as to what you were

4    supposed to ask Mr. Tarbell or get from him or --

5      A.    From my understand -- all I asked him, I wanted the

6    appropriate paperwork to file my disability pension.

7      Q.    Okay.  And what did he tell you?

8      A.    I never talked to him.  He never called me back.  I

9    kept leaving a --

10     Q.    You called the one-eight-hundred number you just

11   gave me, and what happened when you called?

12     A.    I just kept getting his voice mail or answering

13   machine or whatever they give you there.  And I kept

14   leaving a message, and he never called me back.

15     Q.    How many times did you call that number?

16     A.    Oh boy.  I don't know.  You know, I didn't count

17   or -- I didn't count every time I called him.  Could have

18   been four or five, half a dozen.  Who knows?  I know I

19   called him in a certain amount of time period.  I do

20   remember one thing, one thing real distinctly.  This is

21   the last time I called him.  I called him and I said to

22   him, "Sir, if you don't want to talk to me, at least send

23   me the appropriate paperwork."  And that never happened.

24     Q.    Okay.

25     A.    And then I talked to the -- I talked to the union

1  again, and they said that -- told me it's a waste of time;

2  that they weren't calling anyone.  So they weren't --

3  didn't want to make -- they didn't make any contact, as

4  far as I know, with the -- didn't want to make contact

5  with myself or anybody else, so I kind of gave up on it

6  after that.

7      Q.    Okay.  Understanding you don't remember the precise

8  date -- but I want to get as close to a timeframe as

9  possible here -- give me your best recollection of when

10  you placed the first call to Mr. Tarbell.

11     A.    I'd say sometime after I got my -- I'd say in the

12  last week, sometime, of August and probably the -- around

13  the first week of September, if I had to guess, you know.

14     Q.    Okay.

15     A.    Because I wouldn't have called him before I had my

16  determination.  That's kind of pointless.  You know what I

17  mean.

18     Q.    Sure.  Okay.  And for what period of time did you

19  place the -- whatever number of calls you placed,

20  regardless -- and you said the numbers four to six, but I

21  understand that was just an estimate.

22     A.    Yeah.  I -- if I had to remember, you know, it was

23  like, you know, I'd call him once or twice, and then maybe

24  a week later call him again or whatever, you know.  I'm

25  real fuzzy -- I mean, that's a couple years ago -- of the

1     exact amount of time I spent calling him, but I'm sure of

2     it that I at least called him four or five times and, you

3     know, in a two- or three-week period, you know, around

4     that period of time, you know.  I don't know exactly --

5     exact dates or anything, but I didn't really -- I didn't

6     think it was a big deal trying to get ahold of this guy,

7     you understand.

8          Q.    Yeah.  When you would call him -- and I know you

9     had an extension number -- what would happen?  Would his

10    voice mail pick up or a person pick up?

11         A.    There you go.

12         Q.    And give you an option for voicemail?

13         A.    Voicemail, yeah, and I left a message.

14         Q.    Did the voicemail have any options to kick out to

15    a --

16         A.    I think one time -- I can't remember for sure.  I

17    think one time I did talk to a receptionist one time, if I

18    remember correctly.  It was only one time, and that was

19    it.

20         Q.    Do you remember how you ended up talking to a

21    receptionist?

22         A.    It was one of them things where you stay on the

23    line deals.  It was probably by mistake anyways, but it

24    was one of them things where I stayed on the line, and

25    then it was one of them things where, you know, they still

1    wouldn't -- you know, it was like always when you try to

2    call anybody nowadays; they don't want to talk to you

3    anyway.

4        Q.    When you talked to the receptionist, what did you

5    tell him or her?

6        A.    I just wanted to talk to the human resources.

7        Q.    And what did they do?

8        A.    Give me the same runaround.

9        Q.    Well, what -- please -- what do you mean by the

10   same runaround?

11       A.    Just, you know, that he wasn't in or whatever, you

12   know what I mean, same thing, trying to get ahold of him,

13   same thing.  I never got a chance to talk to him.

14       Q.    Did you tell the receptionist -- you had indicated

15   to me you told the receptionist you wanted to talk to

16   human resources.  Did you tell him or her what you

17   actually wanted?

18       A.    I don't think so.  I don't -- you know, I didn't

19   know whether she was -- not that I know of, you know.  I

20   don't remember saying anything like that to them because I

21   wanted to -- what I wanted to say, I wanted to talk to

22   him, you know.  I didn't think she cared one way or the

23   other what I, you know, wanted to talk with that Norm

24   Tarbells for.

25       Q.    What did you understand -- your best understanding

1  of what Norm Tarbell -- what you would get from him had he

2  sent you what you thought he should send you?  Does that

3  make sense?

4     A.    Well, yeah.  The appropriate paperwork to file for

5  your disability pension, that's what I figured.  There

6  wasn't going to be anything else.  I didn't think he was

7  going to send me flowers.

8     Q.    Do you know what that paperwork was, I mean,

9  physically what -- you know.

10    A.    No.  I didn't -- I never seen any.

11    Q.    Did you ever inquire to the union as to whether

12  they had copies of it?

13    A.    Not really.  I didn't think they would.  I never

14  asked them.

15    Q.    Did you have an understanding as to what you would

16  do with that paperwork if you got it?

17    A.    I'd file back with Carlisle.

18    Q.    Okay.  Do you know with whom at Carlisle or what

19  office?

20    A.    I'm only taking a guess, with this guy I was trying

21  to get ahold of.

22    Q.    So you tried to get ahold of Mr. Tarbell over this

23  span of maybe two to three weeks.

24    A.    I'm only taking a guess there.  I --

25    Q.    I understand.  I'm not going to hold you.  I just

1  want to get a general frame of reference for the time

2  period.

3    A.    Right.

4    Q.    And it seems logical to me, if you made your first

5  call in late August or early September, I mean, did you

6  finish calling by the end of October?  Did you call for

7  more than a two-month period?

8    A.    Oh, I don't -- I think after the union said it was

9  going to be pointless, I kind of give up on it then.

10    Q.    And do you remember when the union told you that?

11    A.    Oh, I -- I don't know, probably after that period I

12  got done -- you know, I went and asked, you know, why this

13  guy don't get ahold of me, and I'd say sometime before I

14  went and talked to the attorneys I had to talk to now, 'had

15  to be -- you know, whenever I -- that point was, had to

16  be -- I'd say in September sometime if I had to guess.  I

17  know I didn't go any longer span than that.

18    Q.    Okay.  So sometime in September of '04 you had --

19  prior to that you had tried to call Mr. Tarbell several

20  times; never got through to him.

21    A.    No.

22    Q.    You talked to the union.  They told you it was a

23  waste of time.

24    A.    Right.

25    Q.    And that was it.  That was the last -- at that

1  point you didn't make any further attempts to contact Mr.

2  Tarbell, anyone at Carlisle or anyone at Motion Control.

3  Is that right?

4  A.    No, because that's the only person they told me I

5  had to get ahold of, you know.  I didn't know anybody

6  else.

7  Q.    All right.  Did you have an understanding of if you

8  had been able to obtain the appropriate forms to file a

9  claim for disability and if you had submitted them, what

10  would happen then?  Did you have an understanding of

11  what --

12  A.    Well, only thing I would -- thought was they would

13  have had to approve it no matter what I wrote down, no

14  matter what I was doing there.  I'm sure it had to go for

15  approval.  All I wanted was the paperwork to get it

16  started, and they didn't do that.  They didn't supply that

17  for me.

18  Q.    Did you ever have any contact with any other former

19  Motion Control employee who tried to get -- either tried

20  to get the paperwork you were trying to get or were

21  successful in getting it or file an application?

22  A.    No, not really.  I -- none of these people were --

23  that I know of, that I -- you know, I don't see them or

24  anything like that.  I didn't call them or anything, no,

25  because I figured the union had to know what was going on

1    here.  I do remember one -- I do remember one thing that
2    there was one person I did hear was going through the same
3    thing that I was going through, but that's all scuttle-
4    butt, you know.
5        Q.    Who did you hear was going through the same thing?
6        A.    I think James Clark.
7        Q.    Okay.
8        A.    Now, what he was going through or what was going on
9    there, I don't know.  All I knew that he was going through
10   the same thing.  What the rest of them was doing, I don't
11   know, you know.
12       Q.    So you weren't aware if anyone else was able to
13   obtain application for disability benefits from Carlisle
14   or Motion Control.
15       A.    From what I understood, they all had a tough time.
16   Whether they got them or not, I don't know, but as far as
17   I know, a lot of them didn't.
18       Q.    And where did you get that understanding from?
19       A.    From the union.
20       Q.    And when you say the union, specifically who were
21   you talking to?  You had given me two names before.
22       A.    Well, Greenawalt and Larry Donachy, you know,
23   they're -- I heard bits and pieces from both of them, you
24   know, that they were having a tough time; that none of the
25   people were -- you know, a lot of the people weren't

1  getting their -- who did and who didn't, you know, I

2  didn't ask any questions like that, but they were just,

3  you know, casual talking, you know.  And I just asked what

4  was going on here and things, and that's about what I got

5  out of it.

6      Q.    Okay.  Did you ever have any discussions with any

7  of the union folks or any other employee -- and again,

8  this is specifically excepting any discussions you had

9  with any attorney -- with them about whether or not you

10  would be eligible for disability benefits from Motion

11  Control?

12     A.    No.  They never really -- never said anything to me

13  whether I was going to be eligible or not.  All they did

14  was give me the firm and that to get the appropriate

15  paperwork.  That's the only thing.  They didn't say

16  whether I was -- we'd be eligible to get it or not.  You

17  know, they didn't determine that for none of it.

18     Q.    Okay.  After January 11 of 2002, which is the date

19  when the plant shut down --

20     A.    Okay.

21     Q.    -- shut down, did you continue to receive any

22  payments from Motion Control after that?

23     A.    After the plant closed?

24     Q.    Yeah.

25     A.    Oh yeah.

1    Q.    Do you remember for how long you received those

2    payments?

3    A.    Sixty days.

4    Q.    Okay.  After that --

5    A.    That's under Warren Act.

6    Q.    After you finished receiving the Warren Act

7    payment, did you receive any other -- let's start -- did

8    you receive any other payment from Motion Control?

9    A.    Vacation, severance money, got hospitalization for

10    a number of months.

11    Q.    Okay.  When did you receive those payments, if you

12    remember?

13    A.    Oh, since -- since the plant closed until -- like I

14    said, 60 days we got our wages.  The hospitalization I

15    think went six months?  And then, you know, there was that

16    severance plan, that came quite a bit of time after that,

17    probably at least a year or so after the plant closed

18    before I got that money.  But I got vacation after that.

19    That was a -- that took forever to get that too.  I don't

20    know exact date, but it was a while.

21    Q.    You had indicated that after the plant closed at

22    the -- after the Motion Control plant closed, you went to

23    work for a company, Hunting Foam (sic).

24    A.    Yeah.

25    Q.    I thought that was in the latter part of 2002?

1    A.    Yeah.

2    Q.    Did you work for anyone else between Motion Control

3  and Hunting Foam?

4    A.    I worked for myself for a little bit, installed

5  some equipment, that was about it.

6    Q.    Okay.  Beyond working for yourself, your first

7  employment after Motion Control was for Hunting Foam.

8    A.    Yeah.  Right.

9    Q.    Do you continue to work for Hunting Foam?

10    A.    Do I?

11    Q.    Yeah.

12    A.    Oh no.  I'm disabled.

13    Q.    When did you stop working?

14    A.    That would have been in January there.  But then

15  they brought me back a couple times, so the last time it

16  would have been would probably be probably the end of '02

17  sometime.

18    Q.    Okay.

19    A.    Probably close to '03, really, to tell you the

20  truth.

21    Q.    Did you mean the end of '03 close to '04, because

22  you originally told me you fell January 14 of '03?

23    A.    Right.

24    Q.    So you would have continued to work off and on in

25  '03?

1    A.    Yeah, off and on in '03.  I still -- they had me

2    come in there until -- then I had my operation.  And then

3    after my operation, then it was -- I never really got back

4    to work there.

5    Q.    Okay.  Were you covered by any type of disability

6    plan for Hunting Foam?

7    A.    No, just compensation.

8    Q.    Did you go through any type of Workers Compensation

9    with Hunting Foam?

10    A.    Workers' Comp I got, yeah.

11    Q.    Did you have to go through any type of proceeding

12    to do that?

13    A.    Nope.

14    Q.    Are you aware of any other employee of Motion

15    Control who ever got in touch with Mr. Tarbell?

16    A.    Nope.  Don't know.

17        MR. DEVLIN:  All right.  Those are all the

18    questions I have, Mr. Wilson.

19        THE WITNESS:  Okay.

20        MR. DEVLIN:  Jason, you guys want to read or --

21        MR. METTLEY:  Yeah.  We'll read.

22        MR. DEVLIN:  Jason, if you could just get me that

23    Social Security determination, and then I know we had --

24    you had indicated the answer to the interrogatories to be

25    coming sometime over the next couple weeks, something like

1    that?

2        MR. METTLEY:  Yeah.  We can talk about -- actually,

3    go off the record here.

4        (Off-the-record discussion.)

5        (The deposition was concluded at 10:42 a.m.)

6                        *    *    *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  CERTIFICATE OF COURT REPORTER

2                          I, Elizabeth Schreiber

3  Nissel, a notary public in and for the Commonwealth of

4  Pennsylvania, do hereby certify that the witness,

5  **CHARLES D. WILSON**, was by me duly sworn to testify the

6  truth, the whole truth, and nothing but the truth; that

7  the foregoing deposition was taken at the time and place

8  stated herein; and that the proceedings are contained

9  fully and accurately, to the best of my ability, in the

10  notes taken by me on the deposition of the above petition

11  and that it is a correct transcript of the same.

12

13

14                          IN WITNESS WHEREOF, I have hereunto set my

15  hand and affixed my seal of office this 7th day of August,

16  2006.

17

18

19

20

21  _Elizabeth Schreiber Nissel_
    Elizabeth Schreiber Nissel,

22  RPR and Notary Public

23
                                   NOTARIAL SEAL
24                                 ELIZABETH S NISSEL
                                      Notary Public
                               CITY OF ST MARYS. ELK COUNTY
25                            My Commission Expires Dec 7, 2008

ERRATA SHEET

TO DEPOSITION OF

CHARLES D. WILSON

<u>PAGE</u>    <u>LINE</u>    <u>CORRECTION</u>

26    23  ⎫
27    3   ⎬  HunTingTon  FoAm
27    9   ⎪
28    6   ⎭

17    4   ⎫
18    10  ⎪
21    1   ⎬  Mr. TarbeLLs
21    22  ⎪
22    19  ⎪
23    2   ⎭

CHARLES D. WILSON,
Deponent

1

2          I, **CHARLES D. WILSON**, have read the foregoing

3    deposition, and it is true and correct to the best of my

4    knowledge and belief.

5

6

7

8

9

10

11

12

13                              _____
                                **CHARLES D. WILSON**
14                              Deponent

15

16

17

18

19

20

21

22

23

24

25