IN THE MATTER OF ARBITRATION )
)
)
MOTION CONTROL INDUSTRIES, )
DIVISION OF CARLISLE CORPORATION )
)
)
          and )      Grievance No. 41
)
)
LOCAL 502 AFFILIATED WITH )
INTERNATIONAL UNION OF )
ELECTRONIC, ELECTRICAL, SALARIED, )
MACHINE AND FURNITURE WORKERS, )
AFL-CIO )

Richard W. Perhacs, Esq., for the Employer
Robert A. Eberle, Esq., for the Union
Before Matthew M. Franckiewicz, Arbitrator

## OPINION AND AWARD

This arbitration proceeding involves whether laid off employees were entitled to receive certain vacation pay benefits.

A hearing was held on March 11, 2003 at DuBois, Pennsylvania. Both parties called, examined and cross examined witnesses, and offered documentary evidence. Both parties filed briefs. The record closed with the exchange of briefs on June 16, 2003.

### Contract Provisions Involved

#### PREAMBLE

(4)    In the event the Company's facility located in Ridgway, Pennsylvania, is shut down as a result of relocation of its friction materials operations, the Company agrees to negotiate in good faith with the Union all the benefits under the terms of this Agreement.

#### ARTICLE 11
#### VACATIONS

(150)    Section 1:    [Provisions on scheduling of vacation omitted.]

Exhibit 9

\* \* \*

(153)   Up to two (2) weeks pay in lieu of time off may be taken. Such requests must be designated two (2) weeks in advance.

(154)   Section 2: Effective on Employee's hiring date, paid vacations will be granted as follows:  [Schedule omitted.]

(156)   Section 3: The anniversary date for computation of vacation payments will be calculated on the twelve (12) month period beginning with the employee's hiring date. All unused vacation will be paid on the following anniversary date in lieu of additional time off. Up to a maximum of two (2) days vacation in advance will be permitted if the employee's upcoming anniversary date falls within one (1) month of the requested advance vacation day.

(157)   Section 4: Vacations shall be paid at the employee's classified rate (including shift differential, if applicable).

(158)   (a)   Employees absent during the vacation will be considered as having continuous service.

(159)   Section 5: All Employees whose services are terminated for any cause whatsoever shall receive with their final pay their accumulated vacation hours.

\* \* \*

(162)   Section 8: An employee who works less than a full twelve (12) months during his service year because of layoff for lack of work in line with his seniority, will have his vacation entitlement prorated in increments of 1/12th for each month worked (rounded up to the nearest full day) upon his return to active status. A one-month grace period will be allowed without any reduction in vacation entitlement. Vacation requests will only be denied if both the Company and Union mutually agree.

(163)   For the purpose of this Article, a full day's pay within any month shall count as a full month's vacation credit.

## The Facts

On January 11, 2002 the Company ceased operations at its Ridgway, Pennsylvania facility. It provided bargaining unit employees with WARN Act notice, and paid them pursuant to the provisions of the WARN Act through March 16, 2002. At the time of the shutdown there were approximately 126 bargaining unit employees, down from a peak of roughly 350 in the early 1980s. There are pending unresolved grievances alleging that the Company improperly failed to recall some of the employees after March 16, 2002.

Exhibit 9

On August 2, 2002, the Company paid the laid off employees their "earned" vacation pay, but it has taken the position that it is not obligated to pay "accrued" vacation pay, which is the subject of this arbitration.

As the parties use the term, on an employee's anniversary date he is credited with the appropriate number of vacation days as his "earned" vacation. He may use those days as paid vacation during the year between his most recent anniversary date and the following anniversary date, or may receive pay in lieu for some or all of the earned vacation days. During the period after his most recent anniversary date, the employee accumulates "accrued" vacation, essentially on a pro rata basis based on the number of months worked since his most recent anniversary date. On his next anniversary date, the accrued vacation becomes earned vacation.

As an example, an employee hired on July 1, 1985 would be credited with 20 earned vacation days on July 1, 2001. If he used 15 of those days during the remainder of calendar year 2001, he would have 5 days of earned vacation left as of December 31, 2001. He would also have 10 days of accrued vacation (6/12 x 20 days). The example assumes that the employee was actively working at all relevant times.

In 1992 the language in Section 8 of the Vacations article was added to the collective bargaining agreement. Prior to that time an employee who worked as little as one day during his vacation year was credited with the full vacation for his length of service. During the 1992 negotiations the parties agreed to establish a pro rata system. The Company did not propose eliminating accrued vacation for the period after an employee's most recent anniversary date.

Accounting Clerk Chris Amacher, who administered the vacation benefits and maintained the records, testified that whenever there was a change in the collective bargaining agreement, before implementing the change in the computer system, she made sure that both the Company and the Union were in agreement as to how the system should work.

When an employee's employment terminated for any reason, Amacher would obtain the amount of his earned vacation pay from the records, and calculate his accrued vacation pay. After the 1992 contract changes, when an employee was laid off, Amacher kept track of the amount of earned vacation pay to which the employee was entitled, and calculated his accrued vacation pay through the date of the layoff. Prior to 1994, the vacation pay process for laid off employees involved simply calculating the appropriate amount of earned and accrued vacation. Nothing was paid to the employee while on layoff, unless his employment terminated (for example if an employee resigned in order to accept other employment, as some other employers required them to do). A laid off employee who terminated his employment received a check for his earned and accrued vacation pay, in the same manner as an employee who quit, was discharged, or retired when not on layoff.

In approximately 1994, the Company established a new policy on the payment of vacation pay to employees on layoff, to which the Union had no objection. Prior to that time, disagreements arose as to how much of an employee's earned vacation had been used, and how much was still remaining. In order to eliminate such arguments, the Company began paying vacation pay to employees while on layoff. Under the new policy, on an employee's first anniversary date following the layoff, he was paid all his earned unused vacation. This vacation was "earned" as of the anniversary date immediately preceding the layoff. If the employee remained on layoff long enough to have a second anniversary date, he received another check for the accrued vacation, calculated on a pro rata basis from the anniversary date immediately preceding the layoff through the date of the layoff. After an employee's second anniversary date while on

layoff, no further vacation would be expected to accrue, since the employee was not working. Of course, if such an employee returned to work, additional vacation benefits would begin to accrue at that time. If an employee was recalled after his first anniversary but before his second anniversary while on layoff, the accrued vacation was credited to his record on his return, and would become part of his earned vacation as of his next anniversary date.

During a prior layoff there were roughly 6 or 8 employees who received their second check (accrued vacation pay) while on layoff, and who ultimately remained on layoff for over three years, thereby terminating their seniority and their recall rights. A couple other employees reached their second anniversary while on layoff and received the second check, but ultimately returned to active employment. A few others quit after having received their second (accrued vacation pay) check while on layoff. As mentioned above, some other employees quit while on layoff, at the instance of prospective employers. These employees received their earned and accrued vacation pay when they quit, without waiting for their first or second anniversary dates following their layoffs. The timing of this layoff is not entirely clear, except that it apparently occurred sometime between 1994 (when the system for paying vacation pay to laid off employees changed) and 1998 (when John Orsulak became Human Resources Manager at Ridgway).

With one exception, every employee whose employment terminated for any reason received a check for any earned and unused vacation pay, as well as for any accrued vacation pay. The sole exception was an employee who owed money to the Company. All involved regarded the debt as roughly the same as the amount of his vacation pay, and he received no vacation pay, in return for which his debt to the Company was cancelled.

Local Union Chief Steward Larry Donachy testified that he considers the collective bargaining agreement to be still in effect despite the shutdown, and he regards himself as still having seniority rights, so that if work became available, he would have the right to be recalled.

The current layoffs are unique in that the Company had not previously ceased operations. There have been no resignations since the January 2002 shutdown.

## Issue

The issue, as agreed to by the parties, is whether the Employer was obligated under Article 11 to pay "accrued" vacation pay.

There is no dispute as to the calculation of the vacation pay benefits involved in this case, with one relatively minor exception. The Union, contrary to the Employer, contends that the proper rate of pay on which the benefits should be calculated includes a 15 cent per hour increase effective July 1, 2002. The parties agree that the amount at issue is approximately $318,000 without the 15 cent increase, which would add about $3,000 to the total.

Exhibit 9

## Position of the Union

The Union asserts that the Company always paid the accrued vacation benefits to any employee who separated from employment, whether by resignation, discharge or retirement, without any requirement that the employee return to active status in order to receive the benefit.

It regards the Employer as attempting to create an additional eligibility requirement for vacation benefits through its reading of Article 11 Section 8, and thereby to bring about a forfeiture of vacation benefits. It submits that there is no evidence of bargaining history supporting the Company's reading of Section 8, and that there is no prior instance where this result had obtained, but to the contrary every employee who left the Company for any reason received accrued vacation benefits.

It points to the case of employees who resigned while on layoff and received all vacation benefits (earned and accrued). It maintains that in the current situation, the Company is permanently severing the employment of all the employees but seeking to avoid the obligation for accrued vacation benefits. It regards the distinction between employees who are permanently laid off and other employees permanently separated from employment as arbitrary and artificial.

The Union maintains that Section 8 addresses the timing of the benefit, rather than whether the employee is entitled to the benefit at all. It cites the case of the previous layoff when employees received their accrued vacation benefits at their second anniversaries, while still on layoff. Thus it disputes that "upon his return to active status" creates a rule of eligibility. It considers the Company's payment of those accrued benefits as contradicting the position it takes in this case.

It contends that the employees in this case were effectively terminated, in that the plant closing is permanent, as are the layoffs. It argues that whether or not the employees formally resigned after being laid off would amount to a distinction without a difference.

The Union views the Company's case as resting entirely upon Section 8, but it notes that Section 8 does not address what happens if the employee does not return after the layoff. It urges that Section 8 could as easily be read to provide for full (rather than pro-rated) vacation benefits to employees who do not return from layoff as for the forfeiture of pro-rated vacation benefits to such employees. In any event, it urges that Section 8 should be read in the context of its negotiation history, namely to provide pro-rated benefits for employees who formerly would have qualified for full vacation benefits by working a single day in the new vacation year, but not to create an additional eligibility requirement.

It asks that the grievance be sustained and that the Company be directed to pay the pro-rated vacation benefits to all bargaining unit employees.

## Position of Management

The Employer argues that Article 11 Section 8 addresses the situation at hand, and makes pro-rated vacation eligibility contingent upon the employee's return to active service, an event that has not occurred. It submits that if the purpose of Section 8 had been only to limit vacation benefits when an employee

Exhibit 9

worked only a short time after his or her anniversary, there would have been no need for the final phrase ("upon his return to active status") in the first sentence of Section 8.

It regards as significant that the parties expressly addressed the Company's obligations in the event of plant closing in the Preamble. It contends that there would have been no point in the Union negotiating over pro-rated vacation if the members were already entitled to it.

In the Company's view, the practice described by the Union is irrelevant, since the language of the agreement is clear and unambiguous. It submits that overwhelming arbitral authority supports that plain and unambiguous contract language prevails over any contrary practice. It maintains that the Union's evidence of the practice was weak, and that Amacher could recall only 6 or 8 instances of an employee being paid pro-rated vacation without actually returning to work. It regards instances where employees on layoff resigned and received accrued vacation benefits as irrelevant since in the current case no resignations have occurred. The Company also questions whether the practice continued to exist after 1998.

It considers the 2002 layoff as a unique event in the Company's history, so that the practice, even if proven, is inapplicable since the circumstances are different. It points to the Preamble as further recognition of the uniqueness of a plant closing.

The Employer asserts that the employees have not fulfilled a condition to the receipt of pro-rated vacation (return to active status), and that the Union contradicts any claim that the employees have been effectively terminated, through its position in other pending grievances that some of the employees should be returned to work.

It maintains that the agreement itself does not contain any specific provision dictating payment to a laid off employee absent a return to active service. Further, even under the practice discussed by Amacher, the Company would not yet be obliged to pay the accrued vacation benefits, since employees could not have reached their second anniversary dates following the layoffs by the date of the grievance, and many still have not reached their second anniversaries after the layoffs.

As to the amount on which any vacation benefits should be calculated, the Company points out that Amacher did not testify that any particular rate of pay (and in particular a higher rate than the rate in effect when the vacation pay was accrued) was used. It argues that the contract itself provides no basis on which to conclude that the higher rate is required.

It asks that the grievance be denied.

## Analysis and Conclusions

It has often been observed that vacation benefits have two aspects.

First, vacation provides the employee with a time for rest, relaxation and rejuvenation. Whether the employee uses his or her vacation time to visit the Grand Canyon, to go fishing, or simply to sleep late and watch soap operas, the employee has the opportunity to escape the work routine. If the employee returns

Exhibit 9

to work with renewed vigor and productivity, both employee and employer benefit from vacation. Some collective bargaining agreements explicitly require that an employee must "take" vacation in the form of time off from work, but the current agreement allows employees to receive at least some of their vacation in the form of pay in lieu of time off ( ¶ 153 ), and that unused vacation is paid on the following anniversary date in lieu of additional time off ( ¶ 156 ).

This points up the second aspect of vacation benefits, namely that such benefits are a form of deferred compensation. The employee earns the right to vacation compensation by working now, but enjoys the compensation itself (either in the form of time off with pay or in the form of additional pay in lieu of time off) at a future date.

This second aspect of vacation benefits is critical in the current case, and the resolution of the issue turns on whether such benefits are in effect vested at the time the employee accrues the additional day(s) of vacation entitlement, or whether such accrued benefits may be lost.

In my view, the key to resolving this issue is Paragraph 159: "All Employees whose services are terminated for any cause whatsoever shall receive with their final pay their accumulated vacation hours." It is apparent that the parties did not intend the word "terminated" in this paragraph in the narrow sense of "discharged" but in the broader sense of "ended". The sweeping phrase they chose ("for any cause whatsoever") suggests that they intended the rule set forth in this paragraph to be universal and without exception. Without doubt, every employee's employment ends at some point. It may be through death, discharge, retirement or some other cause, but Paragraph 159 states that regardless of the cause, the employee is to receive his or her "accumulated" vacation.

A permanent layoff with no expectancy of recall constitutes the end of an individual's employment. The collective bargaining agreement in this case calls for retention of seniority for 36 months, and in the case of a partial layoff, it might be difficult to conclude that an employee had no chance of recall at some point prior to the passing of the 36 month period. But here the WARN Act notices have been given, the operation has ceased, and, unfortunately, there is no realistic possibility that the vast majority of the employees will ever return to work for Motion Control. Even though 36 months have not yet passed, it can be said with reasonable certainty that their employment with the Company had ended. (A possible exception exists with respect to a few employees covered by other pending grievances. These will be discussed further within.)

"Accumulated" in Paragraph 159 has the same meaning as "accrued" vacation pay as the parties have used that term. (It will be recalled that the parties use "earned" vacation to refer to vacation benefits based on the last full year, from anniversary date through anniversary date, worked prior to the date in question, and "accrued" vacation to refer to vacation benefits based on the partial year worked from the most recent anniversary date through the date in question.) Employees consistently have been paid their earned vacation (to the extent they have not already received it) as well as their accrued vacation, at the termination of their employment through discharge, resignation, etc.

Paragraph 159 says to the employee, in effect, "Your accrued vacation benefits are in the bank; they cannot be taken from you." Although the Company reads Article 11 Section 8 ( ¶ 162 ) as providing a contrary result in the case of a layoff, I do not agree. The Company's interpretation would create a clash between Paragraph 162 and Paragraph 159, but in my view any interpretation of a collective bargaining agreement that posits one provision as contradicting another is disfavored. Accordingly, I read the phrase "upon his

- 7 -

Exhibit 9

return to active status" in Paragraph 162 as addressing when, rather than whether, a laid off employee is to receive his vacation benefits. The parties in Paragraph 162 appear to have assumed that all layoffs will be temporary, and that the affected employees will in fact return to active employment. But the inaccuracy of that assumption in the current case does not suggest to me that they intended to repeal the general rule stated in Paragraph 159 that an employee's accrued vacation benefits are his or hers to keep. By assuming that all layoffs would be temporary, the parties assumed that an individual's employment would never be terminated by layoff. Although that assumption proved incorrect in the current case, the Paragraph 159 precept continues to apply that whenever an employee's employment does terminate, regardless of how, that employee is entitled to receive all accrued vacation benefits.

Although I do not need to rely on the policy described by Amacher to reach this interpretation, I note that this policy is reasonably consistent with the collective bargaining agreement, as I have interpreted it. As she described it, once an employee reached his first anniversary after the layoff, it would no longer be possible for the employee to use the earned vacation (based on the one year period ending with the employee's most recent anniversary date prior to the layoff) in the form of time off, and thus the employee was entitled to pay in lieu of time off as of the next anniversary date. (See ¶ 156.) With the occurrence of an anniversary date after the layoff, the employee would not build up any further accrued vacation. On the anniversary date, that accrued vacation in effect became earned vacation that the employee could use in the form of time off with pay during the year between his/her first anniversary after the layoff and his/her next anniversary in the event he or she returned to work. But once a second anniversary date arrived, it was likewise impossible to use this vacation in the form of time off, and once again pay in lieu for this vacation was in order. Arguably the policy provided this second vacation pay check prematurely, since under Paragraph 162 the Company might have waited to see whether the employee would have returned to active status. But the policy (and it should be recalled that the Company itself designed the policy, in which the Union acquiesced) can also be regarded as recognizing that when a layoff lasts long enough that an employee observes two anniversary dates, it is sufficiently unlikely that the employee will ever return to active status that the situation envisioned by Paragraph 162 would not occur, and that the employee's employment has as a practical matter terminated, so that the principle of Paragraph 159 governs, even though a theoretical right to recall may still exist.

This leads to the Company's assertion that if the policy described by Amacher applies, it would not yet be liable to pay the accrued vacation benefits. But the situation involved in the current case is a bit different from the one described by Amacher. In that situation, as the layoffs last longer and longer, it seems increasingly unlikely that the employees would return to work, and while a theoretical possibility of recall existed up to 36 months of layoff, a point may be reached before then when it can be said that the employee has no reasonable likelihood of returning. Here, however, it has been apparent all along that the employees have no realistic prospect of returning to work for the Company, so that, despite recall rights, for most of the employees their employment has already effectively ended. Thus under Paragraph 159 they are already entitled to their accrued vacation benefits, and are not required to wait until their second anniversary dates following the layoff.

As noted above, pending grievances assert that a few employees should have been recalled at some point following the layoffs. Under the collective bargaining agreement as I have interpreted it, those employees are entitled at least to accrued vacation pay based on their service from their last anniversary dates prior to the layoff through the date of the layoffs. But depending on the outcome of the other grievances, they may be entitled to additional vacation benefits. In addition, the outcome of those grievances may affect when and how (time off or pay in lieu) those accrued vacations would have been paid. I expect that the

- 8 -

Exhibit 9

parties will be able to apply the principles expressed here to their situations, once the other grievances have been resolved. In the event that this may prove another erroneous assumption, however, I shall retain jurisdiction to resolve any issue in this regard, as well as any issue of how this award applies to the other employees not covered by the other pending grievances.

As to the proper rate of pay for computing the remedy, I conclude that the higher (effective July 1, 2002) rate should be applied. Typically vacation benefits are paid at the rate in effect at the time the vacation is taken or paid. Although it could be argued that the proper rate is the rate in effect at the time the vacation benefit accrued, for some employees this would involve calculating the vacation pay at two different rates. Paragraph 157 states that "Vacations shall be paid at the employee's classified rate . . . " [singular] I interpret this paragraph as meaning the rate in effect at the time the payment is made. Since it is clear that the vacation will not be paid until after July 1, 2002, the rates effective after July 1, 2002 are thus the current rates on which the payments are to be computed.

## Award

The grievance is sustained. The Employer shall make whole bargaining unit employees for its failure to pay them accrued vacation benefits, as set forth above. Jurisdiction is retained for the limited purpose of resolving any disputes which may arise in connection with this award.

Issued June 24, 2003

*Matthew M Franckiewicz*

Exhibit 9